**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| EDWIN L. GRIFFITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-3248 |
| | ) | |
| NANCY BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Edwin L. Griffith appeals from the denial of his application for Social Security Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits). 42 U.S.C. §§ 416(i), 423, 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Griffith filed a Motion for Summary Judgment (d/e 10). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 24). The parties have consented to proceed before this Court pursuant to 28 U.S.C. § 636(c). Joint Consent to the Exercise of Jurisdiction by a United States Magistrate Judge (d/e 7); Transfer of Case for Reassignment to Magistrate Judge entered June 22, 2018 (d/e 9); Text Order entered

<u>February 5, 2019</u>.  For the reasons set forth below, the Decision of the Commissioner is REVERSED and REMANDED.

<u>STATEMENT OF FACTS</u>

Griffith was born June 7, 1967.  He has a GED and previously worked as a truck driver.  He is five foot ten inches tall and weighs approximately 240 pounds.  The Plaintiff lives in Bath, Illinois with his wife.  He suffers from ischemic heart disease, status post two heart attacks; degenerative disc disease, status post two cervical spinal fusion surgeries; obesity; and a sleep-related breathing disorder.  Griffith stopped working any substantial gainful employment after his second heart attack on July 2, 2014.  R. 16, 86, 88, 94.

On March 8, 2014, Griffith went to a local hospital with chest pain.  An EKG showed an inferior ST elevation, which indicated that he suffered a heart attack.  He was transferred to Unit Point Health Methodist Medical Center in Peoria, Illinois (Methodist Hospital).  Griffith underwent an emergency procedure in which a stent was placed in his right coronary artery.  The artery was 80 percent blocked.  The stent reduced the blockage to 0 percent.  Griffith also had "30% distal left main and 75% proximal circumflex disease with moderate diffuse disease. Otherwise [the left ventricle] wall [was] normal with ejection fraction of 60%."  R. 446.

Griffith was discharged on March 10, 2014. His discharge diagnosis was acute inferior wall myocardial infarction, coronary artery disease, hypertension, and hyperlipidemia. He was scheduled to undergo cardiac rehabilitation. R. 446. Griffith reported prior to discharge that his chest pain was gone, but he still had pain in his back, shoulder blade, neck, shoulders, and both arms down to his fingertips. He also reported numbness and tingling in both arms and hands. The doctors at Methodist Hospital concluded that Griffith's continuing pains were chronic and unrelated to his heart attack. R. 446-47.

On March 14, 2014, Griffith saw his primary care physician Dr. Matthew McMillin for a follow-up after his hospitalization. Griffith complained of continuing pain in his shoulders and arms and tingling in his hands and fingers. R. 1177. On examination, Griffith had full range of motion and 5/5 strength with normal gait, intact sensation, and intact reflexes. R. 1179. Griffith was cleared to return to work. R. 1178.

On April 21, 2014, Griffith underwent an exercise nuclear stress test.[1] The test did not show evidence of ischemia. The test showed a "mild intensity, moderate size defect in the basal and mid inferior wall, basal and mid inferolateral wall present on both rest and stress with normal regional

---

[1] The test was also called a myocardial Perf/Spect/Mult test. R. 658.

wall motion consistent with bowl attenuation artifact." The test also showed "Normal left ventricular systolic function with normal regional wall motion . . . ." Griffith had an ejection fraction of 68%. R. 658. Griffith developed sinus tachycardia during the test. R. 660.

On July 6, 2014, Griffith went to Mason District Hospital in Mason County, Illinois (Mason Hospital), with chest pains. He had an abnormal EKG which indicated a possible inferior infarction. He was transferred to Methodist Hospital. R. 476, 479, 978-80. The record submitted to the Social Security Administration does not contain records from Methodist Hospital of his hospitalization in July 6, 2014. On July 11, 2014, Griffith returned to the Mason Hospital with complaints of a rash. The emergency room records from this visit state that Griffith was transferred on July 6, 2014 for "CAD and angioplasty with another stent," and was thereafter discharged on July 8, 2014. R. 459.

On July 15, 2014, Griffith saw Dr. McMillin. Dr. McMillin noted that Griffith went back to work on May 15, 2014. Griffith reported that early June 2014 Griffith went to the emergency room with chest pain. He reported that he was sent to Methodist Hospital and had a repeat heart catherization and stent placement. R. 508, 1167. Griffith reported that the cardiologist believed his heart was stable. The Plaintiff reported moderate back pain.

R. 1168.  Dr. McMillin noted, "[H]e certainly has ongoing degenerative changes to spine – lumbar/cervical – he is unable to work and extremely frustrated."  R. 508, 1167.

On examination, Griffith was 5 foot 10 inches and weighed 278 pounds 6.4 ounces.  Griffith had normal range of motion in his neck and decreased range of motion tenderness, swelling, pain and muscle spasms in his cervical spine.  Griffith also had radicular symptoms in both arms.  R. 509-10, 1168-69.  Dr. McMillan assessed intervertebral cervical disc disorder with myelopathy, cervical region; coronary atherosclerosis – primary; generalized osteoarthritis; and peripheral neuropathy.  Dr. McMillan prescribed a Kenalog-40 corticosteroid injection, tramadol, and gabapentin for pain.  R. 509, 1169.

On September 25, 2014, Griffith again saw Dr. McMillan.  Griffith reported persistent pain in his shoulders, arms, and back.  He said he could not sleep more than a couple of hours because he became so stiff, he had to get up and move.  Griffith reported that increasing his Neurontin dosage did not help with his pain. R. 512.  On examination, Griffith was 5 feet 10 inches tall and weighed 283 pounds.  Dr. McMillan noted that Griffith had normal range of motion in his neck and decreased range of motion, tenderness, swelling, pain, and spasms in his cervical spine, with diffuse

muscular discomfort posterior to the cervical spine with radiculopathy. Griffith had normal neurological findings with normal reflexes and coordination.  Dr. McMillan assessed thoracic or lumbosacral neuritis or radiculitis; intervertebral cervical disc disorder with myelopathy, cervical region; and generalized osteoarthrosis.  McMillan gave Griffith a Kenalog-40 injection and renewed his other medications.  R. 513-14.

On November 6, 2014, Griffith prepared a Social Security Administration Function Report-Adult form. Griffith's wife, Betsy Griffith, completed the form for Griffith.  R. 369.  Griffith reported that his heart, pain, back, ulcers, and hands limited his ability to work. R. 362.  Griffith said he had no problem performing his personal care.  R. 363.  Griffith said he did not do any household chores or yard work.  He said he could not walk, stand, or sit for long periods of time.  Griffith said he did not drive because of sciatica in his right leg and problems with his grip.  Griffith reported that he could only lift less than 10 pounds, could not squat, bend, reach, stand, walk, or sit.  He said he only climbed stairs if necessary.  He reported that he could pay attention continuously and had a fair ability to follow instructions.  R. 367.  He said he did not handle stress well.  He said he was "on edge, moody."  R. 368.

On November 20, 2014, state agency physician Dr. Ernst Bone, M.D. prepared a Physical Residual Functional Capacity Assessment. R. 121-23. Dr. Bone opined that Griffith could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday; occasionally climb ramps, stairs, ladders, ropes, and scaffolding; occasionally stoop and kneel; frequently balance, crouch and crawl; and should avoid concentrated exposure to hazards such as machinery or heights. R. 121-23.

On December 12, 2014, Griffith completed a form entitled Pain Questionnaire.[2] Griffith stated that he started having pain in 1988. He said that he had pain in his back, legs, across his shoulders, both arms and hands, chest, and stomach. He said the pain was constant. R. 387, 391. He said he took tramadol, fentanyl, Norco, nitroglycerin, and Neurontin for the pain. He said he has been taking the medication for years. He said he had a dorsal nerve stimulator implant put in his lower back for pain in 2007. He said the medicine did not completely relieve his pain. He indicated the medicine caused dizziness, drowsiness, and could cause nausea. R. 387-

---

[2] The form does not appear to be a standard Social Security form. The record does not indicate whether Griffith's attorney or someone else supplied the form to him.

88, 391.  Griffith stated that he could walk for 15 feet, stand for 10 minutes, and sit for 15 minutes.  He said that he did not do chores.  R. 389.

On May 4, 2015, state agency physician Dr. Janis Byrd, M.D. prepared two Physical Residual Functional Assessments of Griffith, one as of January 31, 2015, and one for September 9, 2014 to the date of the assessment.  R. 146-51.  Dr. Byrd opined that as of January 31, 2015, Griffith could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally climb ramps, stairs, ladders, ropes, and scaffolding; occasionally stoop; frequently balance, kneel, crouch, and crawl; and avoid concentrated exposure to extreme cold and hazards such as machinery or heights.  R. 146-48.  Byrd opined that Griffith had the same functional limitations for the entire period form September 9, 2014 to the date of her assessment.  R. 149-51.

On May 15, 2015, Griffith saw Dr. McMillan for a follow-up visit. Griffith reported intermittent chest discomfort.  R. 1174.  Dr. McMillan assessed the same objective findings and diagnosis as the September 14, 2014, examination.  R. 1174.  Dr. McMillan continued Griffith's prescriptions for tramadol and fentanyl patch.  R. 1175-76.

On August 4, 2015, Griffith had an echocardiogram of his heart taken. The test showed normal size and function for both ventricles, with no sign of left ventricular hypertrophy.  The left ventricle ejection fraction was 60-65 percent.  R. 1428-29.

On January 7, 2016, Griffith saw Dr. Katherine Fitzgerald, M.D., to establish care.  Griffith reported that he lost 70 pounds in the last seven months without trying.  He reported that he had no appetite.  He reported trouble sleeping.  He said he had sleep apnea but had stopped using his Continuous Positive Airway Pressure (CPAP) machine.  On examination, Griffith weighed 235 pounds.  The examination of Griffith's neck, heart, chest, abdomen, and extremities was normal.  His neurological exam was normal.  R. 2155.  Dr. Fitzgerald assessed anxiety, coronary artery disease of native heart with stable angina pectoris, hypertension, and weight loss. Dr. Fitzgerald stopped Griffith's prescriptions for Effexor and Ativan.  R. 2156.

On January 25, 2016, Griffith had a CT angiography of his abdominal aorta, pelvic arteries and bilateral lower extremities.  R. 1565-66.  The tests showed no vascular etiology to explain Griffith's complaints of lower extremity pain.  R. 1566.

On May 2, 2016, Griffith saw Dr. Keattiyoat Wattanakit, M.D., for a cardiological follow-up examination. Griffith reported that he had sleep apnea but stopped using his CPAP machine. On examination, Griffith's heart rate and rhythm were normal, with no murmur or gallop. R. 1612. R. 1613. Dr. Wattanakit assessed essential hypertension, hypercholesterolemia, coronary artery disease involving native coronary artery of native heart without angina pectoris, sleep apnea but stopped using CPAP machine, chronic fatigue probably related to the untreated sleep apnea, obesity, and chronic pain syndrome. R. 1606, 1613. Dr. Wattanakit stated that the current medical regimen was effective and to continue his pain medications. Dr. Wattanakit prescribed pravastatin and stated that he would start a beta blocker when Griffith resumed using his CPAP machine. R. 1613.

On May 3, 2016, Griffith had a sleep study performed. R. 2064-71. The study results showed no significant sleep related disorders. The study indicated that Griffith's daytime sleepiness was something other than a sleep related breathing disorder. R. 2066.

On June 3, 2016, Griffith saw Fitzgerald to review Griffith's sleep study. Dr. Fitzgerald told Griffith that the sleep study showed that he did not have sleep apnea. She said that he might have restless leg. On

examination, Dr. Fitzgerald noted protruding veins and swelling in his right lower leg from knee to foot. Dr. Fitzgerald assessed restless leg syndrome, depression, and right leg swelling. Dr. Fitzgerald prescribed Requip for the restless leg and stopped his prescription for Celexa. R. 2143.

## THE EVIDENTIARY HEARING

On November 22, 2016, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. R. 80-112. Defendant appeared in person and by his attorney. Vocational Expert Ron Malik also appeared at the hearing. R. 80.

Griffith testified first. He said he lived with his wife. He had a driver's license, but he did not drive because he "can't get comfortable for any length of time to do anything." R. 87. Griffith said that he stopped working on July 2, 2014. Before that date, he worked as a truck driver, a hammer operator in a forge shop, a farm hand, and a maintenance worker. R. 88-90. He lifted 30 to 40 pounds as a farm hand. R. 89.

Griffith testified that he could not work full-time because of his pain:

It's my legs. It's my back. It's my shoulders. You know when I had the heart attack, the amount of pain that I've got going across my shoulders and down my arms, and they said there's nothing that they can do for it. You know so I just have to suck it up and deal with it.

R. 90.  Griffith said the nerve stimulator implant was put in his back in 2008.

He indicated the unit made a big difference but did not work now.  R. 91.

He said the stimulator affected his pain from his mid-chest down to his

toes.  R. 96.  He did not have the funds or transportation to have the

implant repaired or replaced.  R. 91.

Griffith testified that his pain medications were a fentanyl patch,

tramadol, and Celebrex.  The medications helped but interfered with his

sleep.  He took Requip and Tylenol p.m. to help him sleep. He said the

medication helped him go to sleep but not stay asleep.  R. 92-93.  Griffith

testified that he slept three hours at the most at night and then would be

awake "for an hour or so."  He napped four or five times during the day,

every day.  R. 105.

Griffith said he had not gone to the emergency room in the last six

months because his pain level was out of control.  R. 93.  Griffith testified

that the emergency room personnel would not help him with his pain, "They

won't do nothing for you.  They won't do nothing, especially being that I'm

already on 100 milligram Fentanyl patch."  R. 97.

Griffith testified that he had two spinal fusion surgeries in his lower

back.  He wore a brace sometimes.  The brace was prescribed.  R. 94.

Griffith said he had to keep changing positions because of his pain. He said the best position was lying on his left side. The pain was constant. He said that nothing made the pain worse and changing positions made the pain better "[m]aybe for a little bit." R. 96. Griffith later said some activities made the pain worse, but he avoided those activities. He said carrying a gallon or half-gallon of milk would make the pain worse. R. 103. Griffith testified that his pain was currently at a 7 out of 10 while he was testifying and his legs were "just throbbing and hurting like crazy." R. 97. Griffith was standing at the time he rated his pain. Griffith changed positions during the hearing. <u>See</u> R. 86.

Griffith said that he could sit or stand for 5 to 15 minutes before having to change position and walk 50 feet, he could not lift a gallon of milk, and he did not walk to the mailbox to get the mail. R. 97-98.

Griffith said he performed farm work in 2013 and 2014 before his July 2014 heart attack. R. 98-99. Griffith did not go through rehabilitation after his second heart attack in July 2014 because his state medical card would not pay for it. Griffith did not have private insurance. Griffith said that after the second heart attack, he did not have the stamina or endurance to walk. R. 100-01.

Griffith said that he did not help around the house, did not go grocery shopping, and did not go out for social activities. He indicated that if family members or friends came to his house, he visited with them. He testified that he watched television and spent time with his granddaughter when she came to visit. He said he did not go to his granddaughter's school activities. R. 102.

Vocational expert Malik testified. Malik opined that Griffith's past work was medium to heavy semi-skilled or skilled work. R. 107. The ALJ asked Malik the following hypothetical question:

> Okay. I would like you to consider, we'll start at light, a hypothetical individual of the same age, education and having the same past work as this claimant. Limited to a range of light work, with only occasional climbing ladders, ropes or scaffolds. I'll go with occasional ramps and stairs. Occasional balancing, stooping, kneeling, crouching and crawling.
> The need to avoid concentrated exposure to hazards and concentrated exposure to fumes, odors, dusts, gases, poor ventilation and temperature extremes.
> He can only occasionally reach overhead bilaterally. . . .
> Is there any past work he could perform based on this residual functional capacity?

R. 107-08. Malik opined that such a person could not perform Griffith's past relevant work. R. 108. Malik opined that such a person could perform the light work jobs of marker, with 340,000 such jobs in the national economy; and router, with 50,000 such jobs in the national economy. He opined that such a person could perform the sedentary jobs of document

archiver with 15,000 such jobs in the national economy; and addresser or stamper, with 7,000 such jobs in the national economy.  R. 108-09.  Malik said these jobs were representative of the type of work such a person could perform.  Malik said that all the jobs about which he opined were unskilled.  R. 109.

Malik testified that a person had to be on-task 85 to 90 percent of the times in the representative jobs he identified.  Malik said a person could not have more than 8 to 10 unscheduled absences per year from these representative jobs and remain employed.  R. 109-10.  Malik opined that the router and marker jobs could not easily allow an option to change from sitting to standing during the workday, but the sedentary jobs identified would allow such changes in position.  R. 111.  The ALJ then concluded the hearing.

## THE DECISION OF THE ALJ

The ALJ issued her opinion on March 9, 2017.  R. 14-21.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th

Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Griffith met his burden at Steps 1 and 2.  He had not worked since July 2, 2014, and he had the severe impairments of ischemic heart disease, degenerative disc disease, essential hypertension, obesity, and a sleep-related breathing disorder.  R. 16.

The ALJ found at Step 3 that Griffith's impairments or combination of impairments did not meet or equal a Listing.  The ALJ stated that Griffith's heart condition did not meet Listing 4.02 for chronic heart failure.  The ALJ also considered Listing 1.04 for disorders of the spine and Listing 3.09 for chronic pulmonary hypertension.  The ALJ erroneously identified Listing 3.09 as Listing 3.10.  Listing 3.10 does not currently exist and is reserved at this time.  The ALJ, however, applied the requirements of 3.09.  The ALJ also stated that Griffith's obesity had to be considered in making this determination.  R. 17.  The ALJ did not mention Listing 4.04 for ischemic heart disease.

The ALJ did not mention a Listing for sleep apnea because the Listings do not have a separate listing for sleep apnea.  Instead, sleep apnea is analyzed under the body systems affected by the sleep apnea, including chronic pulmonary hypertension under Listing 3.09 and chronic

heart failure under Listing 4.02, both of which were considered by the ALJ.

Listing 3.00P.

> At Step 4, the ALJ found that Griffith had the following RFC:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ladders, ropes, scaffolds, ramps or stairs and occasionally balance, stoop, kneel, crouch or crawl. He must avoid concentrated exposure to hazards and fumes, odors, dust, gases, poor ventilation and temperature extremes. He can do occasional overhead reaching bilaterally.

R. 17. The ALJ relied on the August 2015 echocardiogram that showed a 60 to 65% ejection fraction, the January 2016 angiography that was unremarkable, and the May 2016 heart exam by Dr. Wattanakit. R. 18. The ALJ also relied on the fact that Griffith's back problem did not affect his ability to work in 2013 and 2014 as a farmer hauling grain and did not affect his ability to return to work in May 2014. The ALJ also considered Griffith's obesity in reaching the RFC determination. The ALJ additionally gave significant weight to the opinions of state agency physicians Drs. Bone and Byrd. The ALJ found their opinions consistent with the medical records, although she noted that Drs. Bone and Byrd did not have the benefit of reviewing the latest medical records. R. 17-19.

The ALJ gave less weight to Griffith's statements about the limiting effects of his symptoms because the ALJ said that his symptoms were not fully consistent with the other evidence. The ALJ noted that Griffith had not gone to the emergency room because of pain, he did not need an assistive device to walk, had not received extensive specialized care for pain, and did not have abnormal signs of severe pain such as weight loss or muscle atrophy. The ALJ found that Griffith's testimony that he could not do household chores was "out of proportion to the objective record" and was given reduced weight. R. 19.

Based on the RFC, the ALJ found at Step 4 that Griffith could not perform his past relevant work. The ALJ found at Step 5 that Griffith could perform a significant number of jobs in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Malik that a person with Griffith's age, education, work experience, and RFC could perform the representative jobs of marker, router, document archiver, and addresser. The ALJ concluded that Griffith was not disabled. R. 21

Griffith appealed. On February 15, 2018, the Appeals Council denied his request for review. The decision of the ALJ then became the final

decision of the Commissioner.  R. 1.  Griffith then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

Griffith argues that the ALJ erred in evaluating his heart condition under Listing 4.02 for chronic heart failure instead of Listing 4.04 for ischemic heart disease. The Court agrees that the ALJ failed to consider Listing 4.04. The ALJ did not err in considering Listing 4.02 because chronic heart failure is one of the conditions that may be considered in evaluating the limiting effects of Griffith's sleep apnea. Listing 3.00P. Griffith, however, had ischemic heart disease

> [Ischemic heart disease] results when one or more of your coronary arteries is narrowed or obstructed or, in rare situations, constricted due to vasospasm, interfering with the normal flow of blood to your heart muscle (ischemia). The obstruction may be the result of an embolus, a thrombus, or plaque. When heart muscle tissue dies as a result of the reduced blood supply, it is called a myocardial infarction (heart attack).

Listing 4.00E. The ALJ should have considered whether his condition met or equaled Listing 4.04. The Court cannot determine from the record whether the ALJ considered Listing 4.04 for ischemic heart disease in her decision. The ALJ must identify the Listings considered at Step 3 "and offer more than a perfunctory analysis of the listing." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004). The matter, therefore, must be remanded. The ALJ must provide a more complete analysis at Step 3.

The Commissioner argues that the error was harmless because Griffith has not shown that his condition met Listing 4.04.  The Court, however, cannot tell from the record whether Griffith's condition met Listing 4.04.  Listing 4.04 lists several alternative circumstances under which a person's condition may meet the Listing.  According to Listing 4.04C, a person may meet the Listing if he has 70 percent narrowing in a non-bypassed coronary artery that results in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living. The records from the March 2014 hospitalization for Griffith's first heart attack showed "30% distal left main and 75% proximal circumflex disease with moderate diffuse disease."  R. 446.  The Court cannot tell if this meets the 70 percent narrowing requirement of Listing 4.04C.  Griffith also testified that he could not initiate many activities of daily living.  Given this evidence, the Court cannot say that the ALJ's failure to address Listing 4.04 was harmless error.  The matter must be reversed and remanded.

Griffith argues that the ALJ should be required to secure testimony from a medical expert to determine whether Griffith's condition met a Listing.  The Court will not order the ALJ to do so.  On remand, the ALJ can evaluate the record and determine whether additional expert testimony is required.  See 20 C.F.R. § 404.1512(b).  Griffith and his counsel also have

an obligation to present evidence to support his allegations of disability. See 20 C.F.R.§ 404.1512(a); <u>Skinner v. Astrue</u>, 478 F.3d 836, 842 (7th Cir. 2007) ("[A] claimant represented by counsel is presumed to have made his best case before the ALJ.").  On remand, Griffith may present such evidence or request that the ALJ secure additional medical evidence.[3]

Griffith argues that the ALJ should not rely on state agency physician opinions.  The Court disagrees.  These opinions are competent expert opinion evidence that should be considered in the context of the record as a whole.  <u>See</u> 20 C.F.R. § 404.1513a.  In this case, Griffith did not present any expert opinion evidence.  Again, if he believes additional expert evidence would assist the ALJ in her fact finding, he may present such evidence on remand or request the ALJ to secure such evidence.

Griffith challenges the ALJ analysis of the weight to be given to his testimony regarding the limiting effect of his pain and other symptoms. The Court agrees that, on remand, the ALJ should also provide a more thorough analysis of the evidence of Griffith's symptoms.  The ALJ listed evidence that was not in the record (such as a lack of visits to the emergency room for pain) but did not analyze in any detail the evidence

---

[3] The Court does not anywhere in this opinion mean to comment on whether the ALJ should grant requests.

that was presented.  For example, the ALJ recites Griffith's medication list but does not address the significance of those medications as evidence of the severity of his pain.  Griffith is taking fentanyl and tramadol, two powerful pain medications.  The ALJ does not discuss the extent to which use of these medications supports his claims of the severity of his pain.  Griffith also offered other testimony about his limitations due to his pain.  The ALJ did not discuss this evidence either in any detail.  The ALJ must consider all the material evidence presented.  See e.g., Scrogham v. Colvin, 765 F.3d 685, 698-99(7th Cir. 2014).  On remand, the ALJ should make a more thorough analysis of the evidence of Griffith's symptoms.

Lastly, on remand the ALJ should address Dr. McMillan's statement in the July 15, 2014 treatment note that, "[H]e certainly has ongoing degenerative changes to spine – lumbar/cervical – he is unable to work and extremely frustrated."  R. 508, 1167.  Dr. McMillan was Griffith's primary care physician.  He stated that Griffith was unable to work.  The ALJ did not mention Dr. McMillan's statement.  The ALJ should address the statement on remand.  The Court is not indicating the weight, if any, to be given to this statement, but only that the statement should be addressed in the ALJ's analysis.

THEREFORE, IT IS ORDERED that Plaintiff Edwin Griffith's Motion for Summary Judgment (d/e 10) is ALLOWED; the Defendant Commissioner's Motion for Summary Affirmance (d/e 24) is DENIED. The opinion of the Commissioner is REVERSED and REMANDED to the Commissioner for further proceedings pursuant 42 U.S.C. § 405(g) sentence four. THIS CASE IS CLOSED BEFORE THIS COURT.

ENTER: July 22, 2019

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE